# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR612-005 |
| | ) | |
| CECIL DEWITT NELSON | ) | |

## REPORT AND RECOMMENDATION

Cecil Nelson, one of three defendants in this kidnapping case, seeks to suppress the location data and derivative evidence acquired by federal investigators through the warrantless placement of a Global Positioning System ("GPS") locator on his vehicle. (Doc. 91.) He also seeks to suppress the statements he made to Federal Bureau of Investigation ("FBI") agents on the day of his arrest. (Doc. 51.)

## I. Background

On December 1, 2011, several black males forcibly entered the home of Timothy Marshlick and abducted him at gunpoint. His assailants wore masks and gloves designed to conceal their identities. The

kidnappers appeared to be familiar with Marshlick, for they knew about a safe in his house and were aware that he had a granddaughter (whom they threatened to kill by sniper shot if he failed to cooperate). Marshlick was released the next day following the payment of a $19,000 ransom.

While the FBI was investigating the Marshlick kidnapping, a second kidnapping occurred on January 12, 2012, at the home of William Downs. As in the first kidnapping, Downs was abducted from his home at gunpoint by a group of black men wearing disguise. Downs was released after his wife paid a ransom of approximately $250,000. The kidnappings occurred in relative proximity to each other (Richmond Hill and Pembroke, Georgia).

Early in their investigation of the Marshlick kidnapping, agents identified Cecil Nelson as a person of interest. The Bryan County sheriff, who knew Nelson personally, related that Nelson had ties to Marshlick and was a suspect in a string of local crimes. Nelson had dated the niece of Marshlick's wife, and when that relationship ended on a bad note, he had been accused of assaulting his former girlfriend and setting fire to her mother's home. Additionally, he was a person of interest in the theft of a

safe from another residence in the area.

While Marshlick did not personally believe that Nelson was involved in his kidnapping, Nelson's name surfaced again after the Downs kidnapping. Once Downs was ransomed on January 13, 2012, he was released along a deserted stretch of road and flagged down the first vehicle that he encountered. That vehicle was driven by Nelson, who gave Downs a ride back to town. Downs related only a skeletal description of his kidnapping.

Concluding that Nelson was likely connected to both kidnappings, on January 14, 2012, FBI Special Agent William Klarer had a GPS tracking device placed on Nelson's vehicle while it was parked at a public location. In accordance with established FBI policy at the time, agents did not seek a warrant prior to installing the device. During a phone interview with the agents, Nelson provided various details about the Downs kidnapping (including the number of assailants) that Downs had not divulged to Nelson during the ride back to town. Nelson explained that he had learned this information from a man he had met at a local "cooler" (a club), whom Nelson later identified only as "J Rod."

The GPS tracker data revealed that Nelson had driven his vehicle to various automotive shops. Follow up investigation revealed that Nelson had spent $4,500 in cash at an auto shop located in this District and an additional $1,500 in cash at a racing store in Atlanta. By January 22, 2012, the agents developed information establishing that Nelson had lied when he earlier reported that he was in North Carolina during the Downs kidnapping. They then sought and obtained a warrant to search his residence. In the meantime, FBI Special Agent Kirkconnell (who had established a relationship with Nelson) arranged to have Nelson accompany the agents to J Rod's "cooler." The agents drove to Nelson's neighborhood in an unmarked vehicle and invited him to sit in the back seat next to Agent Kirkconnell, as Agent Tim Fehmel drove them around. Agent Kirkconnell then informed Nelson of his belief that Nelson had lied about the trip to North Carolina and about gaining information from J Rod. Kirkconnell asked if Nelson would accompany him to the sheriff's department for an interview. Kirkconnell explicitly advised Nelson that he was not under arrest. Nelson agreed to the interview.

The agents escorted Nelson to an unused courtroom at the sheriff's department, where he admitted that he had lied about J Rod and the trip to North Carolina. Nearly simultaneously, agents executing a search warrant at Nelson's residence located bank money wrappers identical to those used by Downs' bank (which was the source of the ransom money paid to Downs' kidnappers). Nelson's girlfriend also reported that he had recently obtained more cash than she had ever seen before. (Additionally, co-defendant Gary McDonald had confessed and identified Nelson as having participated in the kidnappings.) Based on the newly-acquired evidence, Agent Klarer instructed Agent Kirkconnell to place Nelson under arrest. Thereafter, Nelson waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and agreed to continue the interview. That same day, the GPS tracker was removed from Nelson's vehicle.

## II. The GPS data is not excludable

In reliance upon the Supreme Court's recent decision in *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012), Nelson argues that the

government violated the Fourth Amendment by attaching a GPS device to the undercarriage of his vehicle without first obtaining a warrant authorizing its installation. He contends, therefore, that the evidence derived by the agents through the monitoring of that device must be suppressed.

*Jones* held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment.[1] *Id.* at 949. *Jones*, however, was decided the day *after* the FBI removed the tracking device from Nelson's vehicle. Prior to *Jones*, it was well established in this circuit that the warrantless installation of an electronic tracking device (or "beeper") to the exterior of a vehicle parked in a public place does not infringe the Fourth Amendment where the agents possess reasonable suspicion to believe that the suspect is engaged in the commission of a drug crime. *United States v. Michael*, 645 F.2d 252, 256-59 (5th Cir. 1981) (en banc). The *Michael* court further noted

---

[1] The Court declined to consider the government's alternative argument that even if the installation and use of the device constituted a search, the search was lawful under the Fourth Amendment because the officers had both reasonable suspicion and probable cause to believe Jones was a major drug dealer. 132 S. Ct. at 954 (finding the argument "forfeited").

"that some members of the majority would hold that the installation of the beeper on the van is not a search or seizure at all, and does not implicate Fourth Amendment interests. While we do not reject this view, we feel that under the facts presented, the installation of the beeper was permissible even if we assumed the installation was a search." *Id.* at 256. While the *Michael* court did not specifically adopt the view that the Fourth Amendment is not even implicated by the warrantless placement of a tracking device on the exterior of a vehicle parked in a public place, a recent Eleventh Circuit panel did just that in an unpublished opinion. *United States v. Smith*, 387 F. App'x 918, 921 (11th Cir. July 20, 2010) (a vehicle owner has "no reasonable expectation of privacy with respect to the exterior of [his] vehicle," and thus the Fourth Amendment is not violated by the warrantless installation of a GPS device on his vehicle when it is parked in a public parking lot). Thus, at the time the GPS device was installed on Nelson's vehicle, there was clear Eleventh Circuit precedent that law enforcement officers were not required to obtain a warrant prior to installing or monitoring such a device.

In *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), the

7

Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule," "[b]ecause suppression would do nothing to deter police misconduct in those circumstances." *Id.* at 2423-24; *see Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system . . . . But when the police act with an objectively reasonable good faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way."); *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012) (evidence seized in good-faith reliance on Eleventh Circuit precedent (later overturned by the Supreme Court) precluded exclusion of that evidence).

The record in this case establishes that when Agent Klarer installed the GPS device on Nelson's vehicle he relied upon established FBI policy that conformed with binding Eleventh Circuit precedent. Even assuming that reasonable suspicion was a necessary predicate for the

warrantless installation of the device, (and it is not clear that even reasonable suspicion was required under then-existing Eleventh Circuit precedent), Nelson did not dispute the government's assertion at the hearing that the agents reasonably believed that Nelson was involved in the kidnappings at the time they placed the tracker on his vehicle. In any event, the Court finds that the agents had developed sufficient information to furnish reasonable suspicion that Nelson was involved in the kidnappings: he had ties to Marshlick (having dated Marshlick's wife's niece), he was the first person Downs encountered after his release by the kidnappers, he knew details about the Downs kidnapping that Downs had not revealed to him during their brief encounter, and he was a suspect in numerous other crimes (including the assault of his former girlfriend and the torching of her mother's home). Because Agent Klarer acted in compliance with binding appellate precedent when he attached the GPS locator to Nelson's vehicle, the exclusionary rule has no application in this case.

## III. Nelson's statements are admissible

Nelson seeks to suppress the statements that he made to Special Agent Kirkconnell on January 22, 2012, prior to his formal arrest and receipt of *Miranda* warnings. He contends that those statements were the product of custodial interrogation and were otherwise involuntary. (Doc. 51.) The record does not support either contention.

*Miranda* applies only to "custodial police interrogation." 384 U.S. at 439; *id.* at 444. "The *Miranda* custody inquiry is an objective test." *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). Courts make

> [t]wo distinct inquiries . . . essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quotes omitted); *accord Alvarado*, 541 U.S. at 663.

Here, Kirkconnell's unrebutted testimony establishes that he explicitly advised Nelson that he was *not* under arrest at the outset the encounter. He invited Nelson to accompany the agents to the sheriff's

department for questioning. Nelson agreed to do so. Nelson was not handcuffed or frisked prior to entering the FBI vehicle or during the pre-arrest phase of the interview. The agents conducted the interview in a small courtroom that remained unlocked. Nelson retained his identification and his cell phone until the agents advised that he was under arrest. At no point did the agents imply that Nelson was required to submit to an interview or that he was not free to break off the encounter and go about his business. Under these circumstances, the Court finds that a reasonable person in Nelson's position would not have felt that he was under arrest or that he had been deprived of his freedom. The fact that the interrogation occurred at the sheriff's department or that Nelson was a suspect does not preclude such a finding. *California v. Behler*, 463 U.S. 1121, 1125 (1983) ("*Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Because Nelson was not in custody during this portion of the questioning, *Miranda* warnings were not required.

Even noncustodial statements, however, are subject to challenge on the ground that they were not voluntarily made. *Jackson v. Denno*, 378 U.S. 386 (1964). To establish that his statements were involuntary, Nelson must show that he was subjected to some form of mental or physical coercion. *Colorado v. Connelly*, 479 U.S. 157, 165 (1986) (there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other."). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quotes and citation omitted); see also *United States v. Gohn*, 2009 WL 112814 at * 3 (S.D. Ga. Jan. 16, 2009).

There is no evidence in this record that the FBI agents subjected Nelson to any form of coercion prior to or during his interrogation. At no point during the two-hour interview did the agents employ or threaten to use any physical force, endeavor to browbeat or intimidate Nelson, or promise him any benefit designed to induce him to speak when he was

otherwise not inclined to do so. Nor has Nelson suggested that he suffered from any form of diminished capacity that the agents exploited in order to pry a confession from him. There is no basis whatsoever for a finding that Nelson's statements were involuntary.

## IV. Conclusion

For the reasons explained below, Nelson has shown no grounds for the suppression of the evidence gathered from the GPS device or the statements that he made to the agents during interrogation. Accordingly his motions to suppress (docs. 51 & 91) should be **DENIED**.[2]

**SO REPORTED AND RECOMMENDED** this 25th day of July, 2012.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[2] Additionally, for the reasons explained on the record at the suppression hearing, the Court **GRANTS** the parties' joint request (docs. 46 & 92) for an "ends of justice" continuance under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7).